UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 13-10140-RGS

UNITED STATES OF AMERICA

v.

MANUELA ANDRADE

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

August 26, 2014

STEARNS, D.J.

Defendant Manuela Andrade is charged with others in a scheme to commit insurance fraud. She seeks to suppress statements she made to agents of the Federal Bureau of Investigation (FBI) and the Massachusetts Insurance Fraud Bureau (MIFB), during an interview at her mother's home in Brockton, Massachusetts, on March 15, 2012. Andrade claims that she was not advised of what are colloquially known as the "*Miranda* warnings" (a fact which is not in dispute), and the *Miranda* omission notwithstanding, that her statements were involuntary. An evidentiary hearing on Andrade's motion was held on August 20, 2014. For reasons that will be explained, the motion will be denied.

Based on the credible testimony and exhibits offered into evidence, I find the following material facts. Andrade was employed as a receptionist at Westgate Physical Therapy (WPT) in Brockton, Massachusetts, where she was also occasionally enrolled as a patient. WPT, for reasons that are not immediately relevant, came under suspicion for what appeared to be

fraudulent insurance billings. A search warrant was executed at WPT's premises in December of 2011, and shortly thereafter, the FBI and MIFB sought to obtain a statement from Andrade whom they believed to possess incriminating information. FBI Agent Benjamin Alvis left his business card at the homes of Andrade's mother and brother, asking her to contact him for an interview. In March of 2012, Alvis and MIFB investigator Kevin Richard saw Andrade's car parked at her mother's home in Brockton. From there they followed her as she drove to a local hair salon. Alvis approached Andrade in the parking lot, identified himself, and asked if he and Richard could speak with her. Andrade replied that it was a bad time because of her hair appointment, but that they could arrange to meet at a later date. She gave Alvis her cell phone number.

After several attempts by Alvis to contact Andrade by telephone, she eventually called back and agreed to meet Alvis and Richard at her mother's home at 10 a.m. on March 15, 2012. The agents arrived for the interview in plain clothes and in unmarked vehicles. They were invited into the home by Andrade and her mother. The agents and Andrade sat at the kitchen table. The interview lasted thirty to forty minutes, during which time Andrade's mother was in and out of the kitchen, although she did not take any part in the interview. At the outset, the agents explained the nature of their investigation. No *Miranda* warnings were given. The interview proceeded in a conversational tone with the participants seated at the table. Towards the end of the interview, Alvis told Andrade that some of her answers appeared

untruthful. He also told her that because she had a criminal record, she could find herself in trouble. Andrade stopped the interview, and said that she wanted to speak to her attorney.[1] She became upset and began crying. The agents stopped the questioning and left the apartment. At the time of the interview, Andrade was twenty-three years old and had two minor prior encounters with the criminal justice system.

## RULINGS OF LAW

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." While "admissions of guilt by wrongdoers, if not coerced, are inherently desirable," *United States v. Washington,* 431 U.S. 181, 187 (1977), the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436 (1966), "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York v. Quarles,* 467 U.S. 649, 654 (1984). The warnings familiarly known as the "*Miranda* rights," while not constitutionally compelled, have a "constitutional underpinning." *Dickerson v. United States*, 530 U.S. 428, 440 n.5, 444 (2000). The warnings are as follows:

---

[1] In her affidavit, Andrade states that she contacted her attorney (who is her attorney of record) immediately after the encounter with the agents in the parking lot. There is no claim, however, that she told the agents before the end of the interview that she was represented by an attorney.

3

> [A suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda,* 384 U.S. at 479. *Miranda*, however, applies only to "custodial interrogation" and not to "[v]olunteered statements of any kind." *Id.* at 478. Custodial interrogation is defined by *Miranda* as questioning [or its functional equivalent] "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [her] freedom of action in any significant way." *Id.* at 444.

A defendant bears the burden of proving that she was in custody when an incriminating statement was made. The ultimate inquiry "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*). "The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody." *Commonwealth v. Damiano*, 422 Mass. 10, 13 (1996).[2] The test involves a variety of factors: "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the

---

[2] As this was a joint federal-state investigation and Andrade relies heavily on Massachusetts cases, I have applied both state and federal law in the analysis, although the result (with the exception of the element of state action with respect to a coerced confession) is the same under both the state and federal constitutions.

4

interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest." *Commonwealth v. Bryant,* 390 Mass. 729, 737 (1984).[3] *See also United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987) (limning identical factors). Other considerations include the duration of the detention, *United States v. Chamberlin*, 644 F.2d 1262, 1266-1267 (9th Cir. 1980) (suspect held in police car for twenty minutes while a search for his accomplice was underway); the authority of officers to make an arrest, *United States v. Jamieson-McKames Pharms,. Inc.*, 651 F.2d 532, 543 (8th Cir. 1981) (FDA inspectors had no arrest powers); the degree of restraint used to detain the suspect, *United States v.*

---

[3] The second of the *Bryant* factors, insofar as it involves an assessment of the interrogator's state of mind, is no longer relevant. "[A]ny inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda.*" *Stansbury v. California*, 511 U.S. 318, 326 (1994). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323. "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry': '[was] there a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Thus, Andrade's focus on the fact that the agents had prior to the interview concluded that she was a subject and potential target of their investigation (a matter not broached with Andrade until the conclusion of the interview) has no bearing on the issue of custody.

*Booth*, 669 F.2d 1231, 1235-1236 (9th Cir. 1981) (suspect placed in handcuffs); the extent to which a suspect is confronted with evidence of her guilt, *United States v. Estrada-Lucas*, 651 F.2d 1261, 1266 (9th Cir. 1980); and the number of officers involved in the detention and questioning, *United States v. Streifel*, 781 F.2d 953, 961 n.13 (1st Cir. 1986).

Here, virtually none of the incidents of custody apply. The interview took place in the familiar setting of Andrade's mother's home at a time of her own choosing, *see Beckwith v. United States*, 425 U.S. 341, 347 (1976); the questioning was was "friendly," "relaxed," and "[un]press[ing]," *Id*. at 343; *see also United States v. Leyva*, 659 F.2d 118, 120 (9th Cir. 1981) (questioning was "low-key"). Andrade was under no physical restraint; her mother was present and available for comfort or consultation; the questioning was factual and nonaccusatory (until the very end); the duration of the interview was brief (thirty to forty minutes); only two interrogators were present (both dressed in civilian clothes and one of whom possessed no law enforcement powers); and Andrade was never told that she was not free to leave or terminate the interview (which she ultimately did). *See Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) ("[T]he coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained."). And finally, while of more relevance to an inquiry into the validity of a waiver of *Miranda* rights, that Andrade knew that she did not have to speak with the agents (as evidenced by her refusal to do so during the first encounter), that she knew of her right to speak only through an attorney (which she exercised

in terminating the interview), and that the agents respected her wishes at each instance (by immediately ceasing the questioning and not making an arrest) are further evidence that the encounter was not custodial. In sum, because custody never attached, there was no obligation on the part of the agents to render *Miranda* warnings, and their failure to do so has no constitutional implications.

This does not, however, end the matter. The voluntariness of a confession and the validity of a waiver are related, but separate issues. A statement may be voluntary and yet not be the product of a knowing and intelligent waiver of a constitutional right. *Edwards v. Arizona*, 451 U.S. 477, 483-484 (1981). Conversely, a waiver may be informed and intelligent and an ensuing confession nonetheless involuntary. *See Withrow v. Williams*, 507 U.S. 680, 712 (1993) (O'Connor, J., *dissenting in part*) ("It is entirely possible to extract a compelled statement despite the most precise and accurate of warnings").

A statement is voluntary if it is "the product of a rational intellect and a free will," *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960), and "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). There is, however, an important caveat. A "substantial element of coercive police conduct" figures prominently in federal cases finding confessions involuntary for purposes of the Fifth and Fourteenth Amendments. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). In *Connelly*, a mentally ill defendant experiencing auditory "command hallucinations" approached an off-duty police officer and spontaneously confessed to a murder. (A waiver of *Miranda* rights was not at issue because, as here, the defendant was not in

custody). While having no quarrel with the determination that the confession was not a product of "a rational intellect and free will," the Supreme Court faulted the Colorado Supreme Court for failing "to recognize the essential link [for constitutional purposes] between coercive activity of the State, on the one hand, and a resulting confession by the defendant, on the other." *Id*. at 165. "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* at 170. *See also United States v. Burns*, 15 F.3d 211, 216 (1st Cir. 1994) (defendant's weakened mental state stemming from her alcoholism was irrelevant to a determination of voluntariness absent some evidence of coercive police conduct); *Luna v. Massachusetts*, 354 F.3d 108, 111 (1st Cir. 2004) (coercion applied by defendant's privately retained attorney). Here, Andrade points to nothing in the nature of official coercion – other than the persistence of the agents in seeking her out – but only to intrinsic factors – her nervousness and anxiety over being questioned about her involvement in criminal activity as evidence that her statements were involuntary. These asseverations fail to satisfy the *Connelly* test.

ORDER

Because of the absence of any legally sufficient showing of custody or official coercion, Andrade's motion to suppress her statements is <u>DENIED</u>.

SO ORDERED.
/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE